## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

| | |
|---|---|
| B.A., and VANDA PHARMACEUTICALS INC., <br><br>                 Plaintiffs, <br><br> v. <br><br> UNITED STATES FOOD AND DRUG ADMINISTRATION; ROBERT M. CALIFF, M.D., in his official capacity as Commissioner of Food and Drugs; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; and XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services, <br><br>                 Defendants. | Civ. No. _____ <br><br> **Declaratory Relief Requested** |

## COMPLAINT

Plaintiffs B.A. and Vanda Pharmaceuticals Inc. (Vanda) bring this complaint against the Food and Drug Administration (FDA), Robert M. Califf, the United States Department of Health and Human Services (HHS), and Xavier Becerra, and allege as follows:

## INTRODUCTION

1.     This case challenges FDA's partial clinical hold preventing Vanda from studying the effects of its experimental new drug, tradipitant, for more than 90 total doses per patient over a period of two years.

2.     Tradipitant has been studied extensively for over 20 years, first by Eli Lilly and, since 2012, by Vanda. Tradipitant is a therapeutic agent that blocks the body's neurokinin 1 receptors; as such, it has the potential to treat a variety of conditions.

3.     Vanda has been studying tradipitant since 2018 for the prevention of symptoms of motion sickness and has conducted three large placebo-controlled clinical trials. Vanda's clinical study results have shown that 170mg of tradipitant can reduce the risk of vomiting induced by motion by more than 70%.

4.     Vanda's latest study seeks to assess tradipitant in real-world conditions. Participants take tradipitant as needed in their daily lives to prevent motion sickness ahead of an anticipated motion-sickness inducing event, such as travel. In the current study, several hundred participants are randomized into groups to receive either 85mg or 170mg of tradipitant for as-needed dosing, for up to 90 individual doses over the 12 months of the study. Importantly, the treatment in this study is designed for acute, episodic dosing, rather than

chronic treatment. As a result, the vast majority of patients did not take more than half of the allowable 90 doses over 12 months.

5.     Vanda has now proposed to extend the study for an additional year and an additional 90 doses. But FDA denied Vanda's request and placed the proposed two-year protocol on a clinical hold, meaning Vanda cannot proceed with the extension of its study.

6.     Plaintiff B.A. has suffered from motion sickness since she was approximately 16 years old. Now in her thirties, she knows well the serious limitations that severe motion sickness causes. B.A. finds it difficult to use any form of transportation—car, taxi, boat, or airplane—without significant planning and preparation. After traveling without medication, B.A. feels severe nausea, dizziness, and lightheadedness for hours. Motion sickness limits B.A.'s work and social life because she must plan her travel to avoid an inopportune episode of severe nausea, and she has often skipped activities, family trips, or other travel because she did not have an available method to ease her symptoms. B.A. has no approved therapeutic options on the market to help her regain control—available drugs are either ineffective or make her experience unwanted side effects, including drowsiness, dry throat, or excessive thirst.

7.    B.A. has experienced tradipitant's effects firsthand—she enrolled in Vanda clinical trials and found tradipitant to be enormously helpful in controlling her nausea induced by motion. She has also not experienced any concerning side effects. For her, tradipitant is life-changing.

8.    B.A. has been participating in Vanda's open-label study, with tremendous results. Due to FDA's clinical hold, however, she is no longer able to take tradipitant to prevent her motion sickness symptoms.

9.    FDA's denial of Vanda's study extension is based on the agency's arbitrary and unreasonable adherence to its outdated requirement that drug sponsors must conduct unnecessary and unethical lethal animal toxicity studies—a position that has since been overtaken by both science and the law. FDA's inflexible and unlawful position now threatens to prevent patients from accessing a promising new therapy for motion-sickness induced vomiting that has been proven to be overwhelmingly safe.

10.    Tradipitant has been shown to be safe to use. Tradipitant has been studied in thousands of animals and humans over the last 20 years, and no serious safety concerns have been identified. Most of the animal studies were conducted by Lilly and included more than 3000 animals including mice rats, rabbits and even dogs. The duration of these studies ranged from months to two years.

11.    Given significant technological advancements over the last two decades, tradipitant has also been evaluated using the most up-to-date technology available to assess drug safety. These methods include micro-physiological systems that can study the effect of a drug on human cells and biological systems in great detail. Again, no relevant safety signals have emerged.

12.    By requiring Vanda to conduct an unnecessary, wasteful, and inhumane six-month toxicity study on dogs before continuing its clinical trial, FDA is acting flatly contrary to its authorizing statute. In 2022, Congress amended the Food, Drug, and Cosmetic Act (FDCA) to specifically alter the requirement that preclinical (now called "nonclinical") tests be conducted in animals—giving drug sponsors the option to forgo animal tests if other studies (such as those using cell-based assays or computer modeling) sufficiently demonstrate the drug's safety. Despite this direction from Congress, FDA continues to adhere to its outdated view that nonrodent toxicity studies are a requirement.

13.    Moreover, FDA is only statutorily authorized to impose a clinical hold by demonstrating an "unreasonable risk to the safety of the persons who are the subjects of the clinical investigation," taking into account certain considerations set forth in the statute with respect to the specific drug at issue or by relying upon a requirement set forth in a duly promulgated regulation. In its partial clinical hold letter, FDA claimed that insufficient evidence exists to

assess the safety of tradipitant in humans. This claim is flatly contradicted by the evidence, which overwhelmingly demonstrates the safety of tradipitant.

14.    Nor does FDA's policy have anything to do with ensuring that approved drugs are safe. Trapitant's safety has been evaluated in hundreds of individuals for periods up to one year and has been well tolerated with no serious adverse events. And aside from the clinical studies in hundreds of people, Vanda has provided the FDA with data from studies using almost 4000 animals including mice, rats, rabbits and even dozens of 1-year-old beagles with extraordinarily high doses of tradipitant. Again, no serious toxicity was identified. All these animals were killed at the end of the experiments, as directed by FDA guidance.

15.    Despite this proven safety track record, FDA continues to demand that Vanda conduct another non-rodent study where young beagles are continuously dosed with tradipitant for 6 months and then killed. This demand has no scientific or legal justification and is irrelevant to human safety and the clinical study Vanda proposed.

16.    Why, then, does FDA insist on it? Because it is required by an international guidance document created in 1997 that allowed FDA to save face with Congress and pharmaceutical companies after it became apparent that EU countries were approving drugs much faster than FDA. Instead of allowing for innovation, FDA entrenched its position through international, nonbinding

guidance so that other countries' regulators are equally burdened by FDA's unproven and irrelevant animal testing requirements.

17.    Three decades later, there are better technologies for evaluating drug safety than animal testing. Micro-physiological and other biological systems can assess the effect of drugs on human organs and cells in extraordinary detail. Congress recognized the value of these breakthrough technologies, but FDA continues to rely on its outdated and unscientific international guidance document to force companies like Vanda to conduct inhumane and unnecessary studies in animals, with no demonstrated benefit for patient safety. Indeed, by continuing to insist on animal studies, FDA places a higher premium on its own guidance documents than on human safety, as evidence continues to emerge that dog studies are not particularly useful for predicting toxicity in humans.

18.    FDA's unlawful and arbitrary action suspending Vanda's ongoing study will put an end to relief for patients like B.A., and unnecessarily bury Vanda's innovative therapies in red tape, with no proven scientific justification for denying patients this relief. This Court should set aside FDA's action.

## PARTIES

19.    Plaintiff B.A. is an individual currently enrolled in Vanda's trial evaluating tradipitant for the treatment of vomiting included by motion. B.A. resides in this district, in North Fort Myers, Florida.

7

20.　　Plaintiff Vanda Pharmaceuticals Inc. is a global biopharmaceutical company focused on the development and commercialization of innovative therapies to address high-priority unmet medical needs and to improve the lives of patients. Vanda is incorporated in Delaware and maintains its principal place of business in Washington, D.C.

21.　　Defendant Food and Drug Administration is an agency of the United States government within the Department of Health and Human Services. The Secretary of Health and Human Services has delegated to FDA the authority to administer the relevant provisions of the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* (FDCA). FDA is headquartered in Silver Spring, Maryland.

22.　　Defendant Robert M. Califf, M.D., is Commissioner of Food and Drugs. The Commissioner of Food and Drugs has delegated authority to administer the FDCA. He is sued in his official capacity only.

23.　　Defendant United States Department of Health and Human Services is a cabinet-level executive department charged with enhancing the health and well-being of all Americans. HHS is headquartered in Washington, D.C.

24.　　Defendant Xavier Becerra is Secretary of Health and Human Services. The Secretary of Health and Human Services is the official charged by law with administering the FDCA. He is sued in his official capacity only.

8

## JURISDICTION AND VENUE

25.    Plaintiffs bring this suit under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

26.    This case arises under the laws of the United States. The Court has jurisdiction under 28 U.S.C. § 1331.

27.    Venue is proper in this district under 28 U.S.C. § 1391(e) because plaintiff B.A. resides in this district and no real property is involved in this action.

## FACTUAL ALLEGATIONS

### A.    Statutory and regulatory background

28.    The Federal Food, Drug, and Cosmetic Act (FDCA) makes it unlawful to "introduce or deliver for introduction into interstate commerce any new drug" unless FDA has approved a new drug application (NDA) for that drug. 21 U.S.C. § 355(a).

29.    An NDA or sNDA must include, among other things, information sufficient to show "whether or not such drug is safe for use and whether such drug is effective in use" and "specimens of the labeling proposed to be used for such drug." 21 U.S.C. § 355(b)(1)(vi). FDA may decline to approve an NDA on certain grounds enumerated in the FDCA, including (1) that the NDA does not include "adequate tests … to show whether or not such drug is safe for use"

and (2) "a lack of substantial evidence that the drug will have the effect it purports or is represented to have." *Id.* § 355(d).

30.     The FDCA requires FDA to create by regulation an exemption from the general prohibition on distributing unapproved drugs in order "to investigate the safety and effectiveness of [such] drugs." 21 U.S.C. § 355(i)(1). Among other factors, the statute permits FDA to "condition[]" the exemption on the submission "of reports, by the manufacturer or the sponsor of the investigation of such drug, of nonclinical tests of such drug adequate to justify the proposed clinical testing." *Id.* § 355(i)(1)(A).

31.     FDA's regulations implementing 21 U.S.C. § 355(i) require the sponsor of a new drug to submit an Investigational New Drug Application (IND) before beginning human clinical trials in the United States. *See* 21 C.F.R. § 312.20. Among other things, an IND must contain information on the drug's chemistry and manufacturing, information on the pharmacological and toxicological effects of the drug from animal studies and in vitro testing, information on any previous human experience with the drug, and a protocol for each planned study. *Id.* § 312.23(a).

32.     By statute, an IND becomes automatically effective 30 days after it is received by FDA, allowing clinical trials to commence. 21 U.S.C. § 355(i)(2); *see also* 21 C.F.R. § 312.40(b)(1).

33.    Once an IND is effective, clinical trials are generally conducted in three phases. *See* 21 C.F.R. § 312.21. Phase 1 involves the initial introduction of a new drug into human subjects and is "designed to determine the metabolism and pharmacological actions of the drug in humans, the side effects associated with the increasing doses, and, if possible, to gain early evidence on effectiveness." *Id.* § 312.21(a)(1). Phase 2 studies are "typically well controlled" and are used to evaluate "effectiveness of the drug for a particular indication … and to determine the common short-term side effects and risks associated with the drug." *Id.* § 312.21(b). Phase 3 studies are expanded trials, designed to "gather … additional information about effectiveness and safety that is needed to evaluate the overall benefit-risk relationship of the drug and to provide an adequate basis for physician labeling." *Id.* § 312.21(c). These "clinical trials alone tak[e] six to seven years on average" to complete. *Biopharmaceutical Research & Development: The Process Behind New Medicines*, PhRMA at 1 (2015), perma.cc/PL5Y-YW7P.

34.    At any point during the investigation of a new drug, FDA may prohibit the sponsor from beginning or continuing particular investigations by imposing a "clinical hold." 21 U.S.C. § 355(i)(3)(A). By regulation, when an "ongoing study" is placed on clinical hold, "no new subjects may be recruited to the study and placed on the investigational drug [, and] patients already in the study should be taken off therapy involving the investigational drug unless

specifically permitted by FDA in the interest of patient safety." 21 C.F.R. § 312.42(a).

35. The FDCA allows FDA to impose a clinical hold in two distinct circumstances. First, a clinical hold is warranted where the drug involved represents an "unreasonable risk to the safety of the persons who are the subjects of the clinical investigation." 21 U.S.C. § 355(i)(3)(B)(i). Second, FDA may impose a hold "for such other reasons as [FDA] may by regulation establish." *Id.* § 355(i)(3)(B)(ii). In either case, the agency must "specify the basis for the clinical hold, including the specific information available to [FDA] which serves as the basis for such clinical hold, and confirm such determination in writing." *Id.* § 355(i)(3)(A).

36. Prior to imposing a clinical hold, FDA regulations require that, "unless patients are exposed to immediate and serious risk, [FDA will] attempt to discuss and satisfactorily resolve the matter with the sponsor before issuing the clinical hold order." 21 C.F.R. § 312.42(c). When a clinical hold order is issued, the order "will identify the studies under the IND to which the hold applies, and will briefly explain the basis for the action … and no more than 30 days after imposition of the clinical hold, the Division Director will provide the sponsor a written explanation of the basis for the hold." *Id.* § 312.42(d).

37.    A clinical trial placed under a clinical hold order "may only resume after FDA … has notified the sponsor that the investigation may proceed." 21 C.F.R. § 312.42(e).

38.    As relevant here, FDA's regulations implementing the FDCA's clinical hold provision repeat the statute's unreasonable-risk-to-safety grounds for a clinical hold. 21 C.F.R. § 312.42(b)(1)(i). FDA regulations separately provide that FDA may issue a clinical hold if "[t]he IND does not contain sufficient information required under § 312.23 to assess the risks to subjects of the proposed studies." *Id.* § 312.42(b)(1)(iv).[1]

39.    Section 312.23 in turn requires an IND to contain certain toxicological information: "[a]dequate information about pharmacological and toxicological studies of the drug involving laboratory animals or in vitro, on the basis of which the sponsor has concluded that it is reasonably safe to conduct the proposed clinical investigations." 21 C.F.R. § 312.23(a)(8). The regulations do not identify any particular nonclinical toxicology studies that must be conducted before a sponsor concludes that a clinical study in human subjects would be reasonably safe. Rather, the regulations provide that the "kind, duration, and scope of animal and other tests required varies with the duration and nature of the proposed clinical investigations." 21 C.F.R. § 312.23(a)(8).

---

[1]    These standards, which are specific to Phase 1 studies, are incorporated for Phase 2 and Phase 3 studies as well. 21 C.F.R. § 312.42(b)(2)(i).

The regulations note that "[g]uidance documents are available from FDA that describe ways in which these requirements may be met." *Id.*

40.    FDA has adopted additional guidance requiring lengthy toxicology studies based on the standards issued by an international, private, non-profit association. *See* FDA, *Guidance for Industry: M3(R2) Nonclinical Safety Studies for the Conduct of Human Clinical Trials and Marketing Authorization for Pharmaceuticals* (Jan. 2010), perma.cc/ZN95-WBBJ (ICH Guidance). Under the guidance—and FDA's application of it to Vanda—Vanda must conduct an additional 6-month repeat dose toxicity study in a non-rodent animal (typically young beagles), even though the already completed 3-month study, as well as a host of other evidence, have not revealed significant safety concerns.

41.    This guidance was developed by the International Conference on Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH), an international, non-governmental nonprofit organization. The ICH was created in the 1980s by regulators from the European Union, the United States, and Japan, in collaboration with industry groups like PhRMA, though it now has members from around the world. *See* ICH, History, www.ich.org/page/history (last visited Jan. 5, 2025); *see also* 64 Fed. Reg. 34,259 (June 25, 1999) ("ICH is concerned with harmonization of technical requirements for the registration of pharmaceutical products among three regions: The European Union, Japan, and the United States. The six ICH

sponsors are the European Commission, the European Federation of Pharmaceutical Industries Associations, the Japanese Ministry of Health and Welfare, the Japanese Pharmaceutical Manufacturers Association, the Centers for Drug Evaluation and Research and Biologics Evaluation and Research, FDA, and the Pharmaceutical Research and Manufacturers of America.").

42.    ICH's mission is to harmonize "the technical guidelines and requirements" for new pharmaceutical products through "scientific consensus" between global regulators and "industry experts." ICH, Mission, www.ich.org/page/mission (last visited Jan. 5, 2025). ICH's website states that a "key" to the success of this project is "the commitment of the ICH regulators," here, the FDA, "to implement the final Guidelines." *Id.* The specific ICH Guidance adopted by FDA, as relevant here, was finalized over 15 years ago. *See* ICH, *M3(R2) Guidance on Nonclinical Safety Studies for the Conduct of Human Clinical Trials and Marketing Authorization for Pharmaceuticals*, www.ich.org/page-multidisciplinary-guidelines (noting adoption of the revised Guideline on June 11, 2009).

43.    The ICH Guidance states that "[i]n principle … the duration of the animal toxicity studies conducted in two mammalian species (one nonrodent) should be equal to or exceed the duration of the human clinical trials up to the maximum recommended duration of the repeated-dose toxicity studies." ICH

Guidance at 7. The guidance's bottom-line conclusion is that "[s]ix-month rodent and 9-month non-rodent studies generally support dosing for longer than 6 months in clinical trials." *Id.*

44.    FDA has interpreted its guidance as imposing a requirement of a 9-month nonrodent study for IND applicants wishing to study a drug in humans for longer than 3 months. *See, e.g.*, *Vanda Pharms., Inc. v. FDA*, 436 F. Supp. 3d 256, 263 (D.D.C. 2020) (describing an FDA clinical hold decision in which FDA "noted that 9-month nonrodent toxicity studies 'are required … per the ICH Guidance for Industry: M3(R2) Nonclinical Safety Studies for the Conduct of Human Clinical Trials and Marketing Authorization for Pharmaceuticals'").

45.    In previous judicial proceedings, FDA stated that the nonrodent toxicity study requirement is not absolute. Transcript of Motion Hearing at 85:13-15, *Vanda Pharms., Inc. v. FDA*, No. 19-301 (D.D.C. Dec. 13, 2019). Nevertheless, FDA has continued to insist on 9-month nonrodent toxicity studies in virtually every case.

46.    Indeed, through FOIA, Vanda has determined that FDA has not, in fact, granted any meaningful exceptions to the nonrodent toxicity requirement. In 2020, Vanda requested through FOIA "[a]ny records of cases in which the requirement … was waived by FDA or otherwise not required as to a particular drug development program; including the reasoning for the waiver or

non-enforcement in each case." Complaint Ex. A, *Vanda Pharms., Inc. v. FDA*, No. 22-cv-1405 (D.D.C. May 19, 2022), ECF No. 1-1.

47.    In response to FOIA litigation commenced after FDA failed to respond to Vanda's request, FDA conducted a search of all NDAs for applications that contained at least one clinical trial with a dosing duration of at least 6 months—that is, those where the ICH M3(R2) Guidance recommends a 9-month nonrodent toxicity study—and excluded categories of applications to which the guidance is irrelevant (such as oncology applications or those relying upon publicly available information or FDA's previous finding of safety). Joint Status Report ¶ 3, *Vanda Pharms., Inc.*, No. 22-cv-1405 (D.D.C. June 20, 2023), ECF No. 23. FDA identified records relating to two drugs (stiripentol and edaravone)—both of which FDA approved based on existing toxicity studies with durations longer than 6 months without 9-month nonrodent toxicity studies. In neither case did the agency affirmatively permit a new or ongoing 6-month clinical trial without such studies.

48.    FDA's second round of searching revealed two additional drugs: omegaven and SMOFlipid. For omagaven, the drug sponsor asked FDA if clinical experience plus shorter nonclinical studies could support a labeled duration of six months; FDA denied the request. FDA did agree, however, that infusion toxicity studies of longer than 4 weeks were infeasible, and so it

"waived" its requirement for a 6-month study. Instead, FDA proposed a different study structure, which the sponsor adopted. The omagaven records thus concerned different studies of different durations—and to the extent relevant, only shows an exception in cases of literal infeasibility. SMOFlipid was even less relevant—the sponsor agreed to conduct a 90-day study in rats but then demonstrated infeasibility and FDA assented to the sponsor's suggestion of a 3-month dog IV toxicity study instead.

49.    None of the examples FDA identified constitute meaningful exceptions to the 9-month nonrodent toxicity study requirement. Yet FDA agreed that it "conducted a search reasonably calculated to uncover all relevant records and searched all locations most likely to hold records responsive to the FOIA request." *See* Joint Status Report, *Vanda Pharms. Inc. v. FDA*, No. 22-cv-1405 (D.D.C. June 20, 2023), ECF No. 23. In other words, FDA was unable to find any relevant cases in which it made an exception to the ICH Guidance.

50.    While the FDCA previously emphasized the presence of animal tests to ensure a drug's safety, Congress recently recognized the significant advancements in medical technology that have reduced the need for extensive (and often cruel) animal testing in service of drug approval.

51.    In 2022, Congress passed the FDA Modernization Act 2.0, which clarified that acceptable nonclinical tests include those "conducted in vitro, in silico, or in chemico, or a nonhuman in vivo test." FDA Modernization Act 2.0.

18

*See* Pub. L. No. 117-328, div. FF, tit. III, sub. B, ch. 1, § 3209 (2022). The Act expressly encourages the use of various alternatives to lethal animal testing as the means of satisfying the FDCA's nonclinical testing requirement, including "Cell-based assays;" "Organ chips and microphysiological systems;" "Computer modeling;" "Other nonhuman or human biology-based test methods, such as bioprinting;" and, as a last resort, "Animal tests." 21 U.S.C. § 355(z).

52.    In the two years since the FDA Modernization Act 2.0 was passed, FDA has not updated its regulations or guidance to conform to the FDA Modernization Act 2.0, nor has it disavowed the ICH guidance that directly contradicts Congress's revisions to the FDCA. Recently, a bipartisan group of senators wrote to FDA, noting that "FDA's regulations relating to animal testing no longer fully conform with applicable law," and inquiring as to when the agency would amend those regulations. *See* Letter from Senators Rand Paul and Cory Booker to Commissioner Robert M. Califf, M.D. (Nov. 16, 2023). But FDA has still not updated its requirements for nonclinical toxicology testing.

### B.    Factual background

53.    Vanda is an innovative pharmaceutical company focused on the development of novel therapies to address high priority unmet medical needs.

### 1.    *Tradipitant and its effect in motion sickness*

54.    Vanda is developing an innovative treatment for motion sickness. Although motion sickness can affect anyone, it has long been of particular interest for national security reasons given the need to rapidly deploy troops under various different transport conditions. Indeed, U.S. military research in the 1940s is what identified the motion sickness treatments available today. However, currently available treatments leave much to be desired—Dramamine, for instance, is often associated with significant and unpleasant side effects, including drowsiness, constipation, and blurred vision. Motion sickness sufferers are eager for new options.

55.    In 2012, Vanda licensed tradipitant, a novel neurokinin-1 (NK-1) antagonist, from Eli Lilly and Company. Although not yet approved for any indication in the United States, tradipitant has been studied extensively since 2003 for multiple conditions. And in 2016, Vanda began studying tradipitant's safety and efficacy for multiple indications, including for the acute prevention of vomiting induced by motion (motion sickness) and as a treatment for symptoms of gastroparesis, a serious chronic digestive disorder.

56.    Tradipitant has been studied in 14 preclinical studies in both rodent and non-rodent species, in a total of 3,669 animals. Some of these studies were toxicity studies, which attempted to discover the level of drug concentration within the body at which adverse health effects emerge. The findings from

20

these studies—which involved dosing of the drug at concentrations many times higher than would ever be used in humans—did not reveal any clinical, laboratory, or pathology evidence of target organ toxicity. Even at the highest dose administered (an 85-fold human equivalent dose in rats and 294-fold human equivalent dose in dogs), no relevant safety observations emerged. Similarly, tradipitant was not harmful in fetal exposure in animal testing even at exceedingly high dose levels beyond what humans would take.

57.    Tradipitant has been studied in humans in 11 Phase 1 studies, 8 Phase 2 studies, 3 double-blind Phase 3 studies, 1 open-label expanded access Phase 3 study, and the open-label portion of 1 ongoing Phase 3 study, in patients and healthy volunteers aged 18 to 75. In combination, more than 2300 individuals have been exposed to tradipitant, and more than 900 of those patients for more than eight weeks, and some for longer than a year. The drug has shown a favorable tolerability profile, with the most common side effects (in less than 10% of the population) being fatigue and sleepiness. No significant safety findings were reported in any of these trials.

58.    In 2018, Vanda began studying tradipitant for the treatment of motion sickness, beginning with a Phase 2 study (VLY-686-2401), which indicated a significant improvement over placebo in the number of incidents of vomiting due to motion sickness. In 2021, Vanda conducted a larger, blinded, placebo-controlled Phase 3 trial to assess the efficacy of tradipitant (Study

VLY-686-3401), which showed significant improvements in incidents of vomiting over the placebo. In 2024, Vanda finished a second, blinded, placebo-controlled Phase 3 trial (Study VLY-686-3404), the results of which are forthcoming.

59.    At no point in these studies did significant safety concerns emerge.

60.    In addition, in 2023, Vanda began a Phase 3 open-label study designed to measure the efficacy and tolerability of tradipitant for the treatment of motion sickness (Study VLY-686-3403). In the open-label study, there is no placebo group. Instead, participants are randomized into groups to receive either 85mg or 170mg of tradipitant to take as-needed before a motion-sickness triggering event, after which they report their symptoms and any adverse reactions.

61.    Because Vanda is studying tradipitant for the acute prevention of motion-induced vomiting, participants in Study 3403 do not take tradipitant every day. Instead, participants are directed to take tradipitant as needed 60 to 120 minutes before a triggering event (like a car ride). Under the study protocol, participants were able to take tradipitant as needed for up to 90 acute doses in a 12-month period.

## 2.    *Vanda's open-label study and partial clinical hold*

62.    On October 11, 2024, Vanda submitted an amendment to the study protocol seeking to extend the study duration for an additional year and an additional 90 doses (i.e., for up to 180 doses in a 24-month period).

63.    On November 15, 2024, FDA sent a letter to Vanda entitled "Deficiency—Potential Hold Issues" regarding the protocol amendment. FDA wrote that "the nonclinical information submitted to the IND supports a maximum treatment duration of 3 months (i.e., 90 dosing days)" and FDA was "concerned that the IND does not contain sufficient information to assess the risks to subjects for the proposed duration of treatment."

64.    Vanda responded to FDA's letter on November 20, 2024. Vanda explained that in the original protocol, "which allowed acute dosing for 12 months, many participants took only a few doses in the 12-month period, and the vast majority (approximately 80%) took fewer than half (45) of the maximum allowed doses." Vanda explained that this was to be expected with a medication designed for acute, episodic dosing, rather than chronic treatment. Thus, "the majority of participants in the proposed amendment would be expected to take fewer than 90 doses over 24 months."

65.    Vanda further explained that FDA has previously approved drugs for acute, non-chronic indications with toxicology studies lasting only 28 days.

66.    FDA replied with a follow-up letter on November 26, 2024, entitled "Advice/Information Request." FDA did not repeat its concern about needing toxicology studies for treatment lasting longer than 90 days. Instead, FDA noted its concern that Study 3403 would not result in interpretable data due to a lack of a placebo control arm. FDA also responded via an unsigned email communication, which reiterated its prior concern about safety information for more than 90 dosing days and suggesting that Vanda amend the protocol to limit it to 90 dosing days over 24 months.

67.    On December 4, 2024, FDA issued a further follow-up letter reiterating its concern and requesting a response from Vanda by December 6, 2024.

68.    On December 6, 2024, Vanda responded to FDA. Vanda reiterated its position that the body of safety data available for tradipitant is sufficient to support the protocol amendment for 180 dosing days over 24 months, and that there is no scientific basis to require additional lethal studies in dogs as a prerequisite to the study. As such, Vanda stated that it did not intend to withdraw or modify the amended study protocol.

69.    On December 23, 2024, FDA issued a partial clinical hold for Study 3403. The letter stated that Vanda's amendment "exceed[ed] the maximum 90 dosing days that is supported by the information submitted to the IND" and that to resolve the partial clinical hold, Vanda "should conduct a toxicology

study in a non-rodent species of at least 6 months duration, as recommended previously, to characterize the risk of cumulative toxicity of tradipitant … to support dosing beyond 90 dosing days."

### 3. B.A. and her severe motion sickness

70. Plaintiff B.A. has suffered from motion sickness for over a decade. Her condition makes it difficult for her to travel by car, taxi, public transit, boat, or airplane. Experiencing motion sickness interferes with B.A.'s work and social life, as she often has to plan her travel to avoid having a nausea episode. The other available medications to treat motion sickness—typically antihistamines—make B.A. very sleepy, which makes it difficult to take those medications during the day. In addition, living in Florida, B.A. is an outdoor enthusiast and loves to take advantage of the beautiful weather and scenic activities that Florida offers, including boating, fishing, scuba diving, and off-roading. She is typically unable to partake in these activities without some form of medication to control her motion sickness, however.

71. B.A. enrolled in Vanda's clinical trial at the suggestion of her physician. When taking tradipitant, B.A. no longer experiences significant effects of motion sickness and rarely feels nausea during road trips or boat rides. She also does not feel drowsy after taking tradipitant. Using tradipitant has improved her life significantly.

72.    B.A. is concerned about the partial clinical hold placed on Vanda's study, because she has lost access to tradipitant, which has made a significant difference in her symptoms and daily life, as a result. B.A. also feels strongly that lethal animal studies should not be conducted on pharmaceutical products unless absolutely necessary.

### 4.    *FDA's policy is unethical and does not advance public health.*

73.    Tradipitant's safety has been evaluated in hundreds of individuals for periods of up to 3 months of daily dosing and in several dozen more for durations of 6 months to 4 years. Tradipitant has been well tolerated with no serious adverse events.

74.    In addition to the clinical studies in hundreds of people, Vanda has provided the FDA with studies of almost 4000 animals including mice, rats, rabbits and dozens of dogs treated for up to 3 months with extraordinary high doses of tradipitant. Again, no serious toxicity was identified. All these animals were killed at the end of the experiments. And this includes dozens of 1-year-old beagle dogs.

75.    Vanda is not opposed to conducting animal studies when necessary. Vanda does consider it unethical, however, to conduct lengthy animal studies that require the unjustified killing of young dogs when there is little or no evidence that the study will yield meaningful additional information about

the drug's safety. Moreover, this unjustified and unnecessary requirement further increases *human* suffering, as it keeps useful therapies like tradipitant out of the hands of patients, like B.A., who need them.

76.    FDA has not articulated a scientific justification for its policy—for the simple reason that there is none. The requirement is not, and has never been, supported by convincing evidence of the predictive value of long-term repeat dose animal toxicity studies for predicting toxicity in humans.[2] FDA has itself undertaken a review of the utility of dog toxicity studies for food additives, concluding that using alternatives to dog studies is "potentially less time consuming, less expensive, and perhaps more predictive of human health risk compared to animal models." B.M. Flannery et al., *Retrospective Analysis of*

---

[2]    Indeed, many scientific studies, including some from over ten years ago, have demonstrated that animal toxicity studies are highly inconsistent, if not entirely useless, predictors of toxicity in humans. *E.g.*, Jarrod Bailey *et al.*, *An Analysis of the Use of Dogs in Predicting Human Toxicology and Drug Safety*, 41 ALTA 335, 340 (2013) ("This analysis of the most comprehensive quantitative database of publicly-available animal toxicity studies yet compiled, suggests that dogs are highly inconsistent predictors of toxic responses in humans, and that the predictions they can provide ***are little better than those that could be obtained by chance***—or tossing a coin—when considering whether or not a compound should proceed to testing in humans.") (emphasis added); Nina Hasiwa, *Critical Evaluation of the Use of Dogs in Biomedical Research and Testing in Europe*, 28 ALTEX 326, 332 (2011) ("[W]hen the correct definitions of sensitivity, specificity and likelihood ratio are used, the data provide no statistically credible evidence that these animal models [dogs and monkeys] contribute any predictive value.").

*Dog Study Data from Food and Color Additive Petitions*, 14 Reg. Toxicology & Pharmacology, 105523 (Nov. 2023).

77.    For similar reasons, the Environmental Protection Agency (EPA) has moved away from using nonclinical animal toxicity studies to evaluate the safety of pesticides. An extensive analysis of toxicity studies in dogs that compared findings from three-month studies against findings in twelve-month studies found that twelvemonth studies "did not provide additional essential toxicity information." 72 Fed. Reg. 60,934, 60,940-41 (Oct. 26, 2007). In 2007, on the basis of that analysis, EPA revised its regulations to eliminate the requirement to conduct chronic toxicity studies in dogs. *Id.*; 40 C.F.R. § 158.500.

78.    And regardless of whether FDA's non-rodent animal study requirement was justified in 1997 when the ICH Guidance was formulated (it wasn't), it certainly has no scientific basis today. There have been significant technological advancements in safety testing since then, and even since 2010 when FDA adopted the revised ICH Guidance. Today myriad technologies exist that allow the effect of drugs on human organ cells to be studied in extraordinary detail, including various microphysiological systems with multiple organ types represented. FDA has disregarded these technologies and stuck instead with archaic requirements that require killing dogs without justification.

79.    It is unclear what FDA's justification is for adhering to his outdated guidance, aside from the amorphous goal of "harmonizing" FDA practice

with that of other countries' regulators. To the extent that goal is even permissible under the FDCA, it certainly cannot override Congress's clear direction to FDA in the FDA Modernization Act 2.0 that it must consider alternatives to lethal, and unnecessary, animal studies.

## FDA'S PARTIAL CLINICAL HOLD IS UNLAWFUL.

80.    FDA's partial clinical hold is unlawful and should be set aside.

### A.    FDA's partial clinical hold is contrary to statute.

81.    In 2022, Congress passed the FDA Modernization Act 2.0, which expressly amended Section 505 of the FDCA (21 U.S.C. § 355) to permit non-animal safety studies as sufficient to support a drug's approval.[3] The law replaces the prior reference to "preclinical tests (including tests on animals)" with a list of "nonclinical tests" which "may include" "(1) Cell-based assays, (2) Organ chips and microphysiological systems, (3) Computer modeling, (4) Other nonhuman or human biology-based test methods, such as bioprinting, and (5) Animal tests." *Id.*

82.    Senators Rand Paul (R-KY) and Cory Booker (D-NJ), both original cosponsors of the law, emphasized that it would "avoid the needless suffering of countless animals, now that experimental drug testing can be done with

---

[3]    Reducing FDA's reliance on animal testing has been a concern of some members of Congress for some time. *See* Hearings Before a Subcommittee of the Committee on Appropriations, S. Hrg. 105-858 at 1275 (Mar. 31, 1998) (Prepared Statement of Sara Amundson, Doris Day Animal League) (noting that in 1998, the European Union had already passed a directive to replace animal tests for safety assessments of cosmetics).

modern non-animal alternatives that are more scientifically relevant" and represented a "bipartisan effort … that will accelerate innovation and get safer, more effective drugs to market more quickly by cutting red tape that is not supported by current science." Adashi et al., *The FDA Modernization Act 2.0: Drug Testing in Animals is Rendered Optional*, 136 Am. J. Med. 853, 854 (Sept. 2023).

83.    Nevertheless, FDA has refused to update its guidance on nonclinical safety testing—which is based not on U.S. law but on the views of  an international, nongovernmental organization—and continues to adhere to this outdated view even in the face of congressional revision to the FDCA.

84.    Further, FDA has continued to apply its arbitrary and outdated view that nonrodent animal toxicity studies are *required* before Vanda may conduct certain studies, despite the express authorization in the statute for FDA to consider non-animal toxicity studies as evidence of a drug's safety in humans.

85.    Specifically, FDA's partial clinical hold letter explains that the basis for its hold is "[i]nsufficient information to assess risks to human subjects." FDA states that the "nonclinical information submitted to the IND includes a 6-month study in a rodent species and a 3-month study in a non-rodent species, which support *the maximum allowable* 90 dosing days."

30

86.    FDA further stated that Vanda could not continue the study until it conducted a repeat-dose toxicity study in a non-rodent species "of at least 6 months duration" or amend the study protocol to limit the study to 90 dosing days.

87.    Without question, FDA based this requirement on the ICH guidance, which requires that clinical trials lasting longer than two weeks "be supported by repeated-dose toxicity studies of at least equivalent duration" and recommends "6-month rodent and 9-month non-rodent repeat-dose toxicity studies to support dosing for longer than 6 months in clinical trials." ICH Guidance at 7, 8; *see also id.* at 8 (Table 1, footnote d) (noting that in the EU, 6-month non-rodent studies are acceptable). The ICH Guidance also provides that, for "short-term drug exposure … such as intermittent treatment of migraine," six-month nonrodent studies can support clinical trial durations of longer than six-months. *Id.* at 8 (Table 1, footnote d). Nowhere in the ICH Guidance is there scientific evidence or a stated scientific rationale for the utility of studies of this length for predicting the toxicity in humans. And nowhere in FDA's clinical hold letter does the agency provide evidence or a justification for their necessity.

88.    FDA did not consider the other significant nonclinical evidence of tradipitant's safety. FDA also did not consider Vanda's two examples of ap-

proved acute indications that were supported with only 28-day repeat dose toxicity studies, saying only that those examples "do not suggest that clinical trials for 'acute' indications have been permitted to proceed without adequate nonclinical data to support the duration of the clinical trial," (*id.*), without further explanation.

89.    FDA's partial clinical hold is therefore contrary to law and in excess of the agency's statutory authority because it requires nonrodent animal safety testing despite Congress's clear amendment to the law mandating that nonanimal safety testing can be sufficient.

90.    The Administrative Procedure Act (APA) authorizes courts to "hold unlawful and set aside" agency action that is "not in accordance with law" or "in excess of statutory jurisdiction … or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

91.    An agency "'literally has no power to act'—including under its regulations—unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (quoting *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)). FDA is not authorized to impose additional requirements beyond what is allowed in the statute. *See Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 328 (2014) (noting the "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate").

92.    Because FDA's partial clinical hold is based on additional requirements for animal testing that are not imposed by the agency's governing statute, its action is contrary to law and must be set aside.

**B.    FDA has failed to follow its own regulations governing clinical holds by refusing to engage in a dialogue.**

93.    "The *Accardi* doctrine—derived from *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954)—'stands for the unremarkable proposition that an agency must abide by its own regulations.'" *Walker v. Att'y Gen.*, 848 F. App'x 404, 404 (11th Cir. 2021) (quoting *Chevron Oil Co. v. Andrus*, 588 F.2d 1383, 1386 (5th Cir. 1979)); *accord Steenholdt v. FAA*, 314 F.3d 633, 639 (D.C. Cir. 2003) ("The *Accardi* doctrine requires federal agencies to follow their own rules, even gratuitous procedural rules that limit otherwise discretionary actions.").

94.    Under this doctrine, "[i]t has long been settled that a federal agency must adhere firmly to self-adopted rules by which the interests of others are to be regulated." *Mass. Fair Share v. Law Enf't Assistance Admin.*, 758 F.2d 708, 711 (D.C. Cir. 1985); *see Sierra Club v. U.S. Army Corps of Eng'rs*, 464 F. Supp. 2d 1171, 1183 (M.D. Fla. 2006), *aff'd*, 508 F.3d 1332 (11th Cir. 2007) ("[W]here an agency has promulgated regulations and procedures for implementing a statutory scheme, the agency must 'scrupulously follow' those regulations and procedures.") (quoting *Sierra Club v. Martin*, 168 F.3d 1, 4

(11th Cir. 1999)). And "courts must overturn agency actions which do not scrupulously follow the regulations and procedures promulgated by the agency itself." *Sierra Club v. Martin*, 168 F.3d 1, 4 (11th Cir. 1999); *see also Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1264 (11th Cir. 2007) ("[A] plaintiff has established procedural injury standing if he has established that the claimed violation of the procedural right caused a concrete injury in fact to an interest of the plaintiff that the statute was designed to protect.").

95.    Here, FDA regulations require the agency to "attempt to discuss and satisfactorily resolve the matter with the sponsor before issuing [a] clinical hold order." 21 C.F.R. § 312.42(c).

96.    This regulation requires a "meaningful … discussion or back and forth" between FDA and the drug sponsor. *See* Mtn. Hearing Tr. at 44-48, 52-55, *Regenexbio, Inc. v. FDA*, No. 19-cv-3373 (D.D.C. Dec. 4, 2019) (court suggesting that this regulation requires such a "meaningful … discussion" or "a meaningful attempt to consult").

97.    FDA had no such "meaningful" discussion with Vanda before issuing the partial clinical hold here. Instead, FDA effectively provided Vanda with an ultimatum—either amend the study protocol to limit it to 90 dosing days or conduct an additional six-month toxicity study in dogs, or the trial could not proceed.

98.    This conduct by the agency violated FDA's own regulations governing imposition of a clinical hold and is therefore "'unlawful' action under the APA." *Damus*, 313 F. Supp. 3d at 337 (setting aside agency action for an *Accardi* violation).

### C.    FDA improperly relied on the ICH guidance as a binding, legislative rule.

99.    The APA requires agencies to publish in the Federal Register a "notice of proposed rulemaking" before adopting substantive rules, and to "give interested persons an opportunity to participate in the rule making[.]" 5 U.S.C. § 553(b), (c).

100.    The FDCA is clear: if FDA makes an affirmative finding that that a drug imposes an unreasonable risk to patients, it can impose a clinical hold. If it does not make such a finding, FDA may impose a clinical hold *only* "for such other reasons as the Secretary may *by regulation* establish." 21 U.S.C. § 355(i)(3)(B)(ii). Thus, to invoke its authority under this section, the FDA must establish standards via a proper notice and comment rulemaking before it can rely on that rule in a particular individual case.

101.    In its partial clinical hold letter, FDA cited a regulation: "21 C.F.R. § 312.42(b)(2)(i): Insufficient information to assess risks to human subjects." But that regulation does not contain a requirement that drug sponsors conduct

nonrodent toxicity studies of a particular length before conducting clinical trials in humans. To the contrary—FDA's regulations require that the IND include "[a]dequate information about pharmacological and toxicological studies of the drug involving laboratory animals or in vitro, on the basis of which the sponsor has concluded that it is reasonably safe to conduct the proposed clinical investigations." 21 C.F.R. § 312.23(a)(8). And that regulation disclaims any inflexible rules, stating instead that "[t]he kind, duration, and scope of animal and other tests required varies with the duration and nature of the proposed clinical investigations," and refers sponsors generally to "[g]uidance documents." *Id.*

102.    Indeed, FDA's explanation of its justification for the hold is internally inconsistent—FDA says it cannot sufficiently evaluate safety without the 6-month nonrodent toxicity study, meaning that such a study would be required in all cases to permit a "sufficient" evaluation. But FDA also says it is applying the requirement based on its assessment of tradipitant's specific profile, which suggests that FDA's has been able to evaluate the safety record and determined that the additional study is necessary—an obviously arbitrary and capricious conclusion, given the extraordinary safety record of tradipitant outlined above. *See supra*, ¶¶ 54-61.

103.    Further, FDA's regulations explicitly state that its "[g]uidance documents do not establish legally enforceable rights or responsibilities" and "do

not legally bind the public or FDA." 21 C.F.R. § 10.115(d)(1). (Of course, this is also a correct statement of governing law—agency guidance documents *cannot* be relied upon as legally binding). Furthermore, FDA regulations also indicate that regulated parties "may choose to use an approach other than the one set forth in a guidance document." *Id.* § 10.115(d)(2). Guidance documents merely "represent the agency's current thinking." *Id.* § 10.115(d)(3).

104.   In short, nowhere in FDA's regulations is there a substantive rule requiring that a nonrodent toxicity study of 6 months—or any duration, for that matter—before a study in humans can go beyond 90 dosing days. Such a "requirement," to the extent that it exists at all, appears only in the ICH guidance, when has never been adopted as a regulation through notice-and-comment rulemaking, is derived not from U.S. law but from the views of an unelected international body, and has been superseded by statute in any event. But FDA nevertheless relied on the ICH Guidance as a binding rule even though it was not properly issued through the notice-and-comment rulemaking process. This is not entirely surprising, given that FDA employees are instructed to "not deviate" from guidance documents "without appropriate justification and supervisory concurrence." 21 U.S.C. § 371(h)(1); 21 C.F.R. § 10.115. There is therefore little incentive for FDA reviewers to deviate from

guidance even when warranted by statute, resulting in a purportedly "non-binding" requirement being applied in every case.[4]

105.    By treating the ICH Guidance as a binding requirement, despite not having submitted the ICH Guidance to notice-and-comment procedures, FDA violated its obligations under the APA. *See, e.g.*, *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015) (describing how only rules issued through the notice-and-comment process can bind the public and "have the force and effect of law"); *accord Green Rock LLC v. IRS*, 104 F.4th 220, 229 (11th Cir. 2024) ("Because the notice was a legislative rule and Congress did not expressly exempt the Service from notice-and-comment rulemaking, Notice 2017-10 is not binding on Green Rock."). FDA also failed to meet the standard set for it in 21 U.S.C. § 355(i)(3)(B)(iii), because it did not impose this clinical hold for a "reason" set "by regulation."

---

[4]    The problem of agencies relying on nonbinding guidance as binding has even caught the attention of the president. *See* Executive Order 13891, *Promoting the Rule of Law Through Improved Agency Guidance Documents*, 84 Fed. Reg. 55,235 (Oct. 9, 2019) ("Agencies may clarify existing obligations through non-binding guidance documents, which the APA exempts from notice-and-comment requirements. Yet agencies have sometimes used this authority inappropriately in attempts to regulate the public without following the rulemaking procedures of the APA. Even when accompanied by a disclaimer that it is non-binding, a guidance document issued by an agency may carry the implicit threat of enforcement action if the regulated public does not comply.").

### D.    FDA's decision is arbitrary and capricious.

106.    "Agency action is considered arbitrary or capricious if the agency has 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Sierra Club, Inc. v. Leavitt*, 488 F.3d 904, 911 (11th Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 (1983)). "The reviewing court may not make up for" deficiencies in the agency's decisionmaking, which is to say that the court 'may not supply a reasoned basis for the agency's action that the agency itself has not given.'" *Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1254 (11th Cir. 2007) (quoting *Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)).

107.    In addition, "the reviewing court must consider whether the record contains substantial evidence in support of an agency decision." *Nat'l Parks Conservation Ass'n v. U.S. Dep't of the Interior*, 835 F.3d 1377, 1384 (11th Cir. 2016). "Substantial evidence is 'relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Stone & Webster Constr., Inc. v. U.S. Dep't of Labor*, 684 F.3d 1127, 1133 (11th Cir. 2012)).

### 1.    FDA's decision is contrary to the evidence before it.

108.    *First*, the FDA's decision is arbitrary and capricious because it "runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43.

109.    There is overwhelming evidence of tradipitant's safety in the record. As noted above, tradipitant has been studied extensively in humans and animals for multiple indications since 2003, and no relevant human safety signals have emerged. This includes toxicity studies in both rodent and non-rodent species, in a total of 3,669 animals, and human trials with over 2300 patients total. In addition, dozens of patients are being treated with tradipitant for gastroparesis in an expanded access program, many for more than a year, and some for more than three years. No significant safety findings were reported in any of these trials.

110.    "To survive arbitrary and capricious review, an agency must 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Nat'l Mining Ass'n v. United Steel Workers*, 985 F.3d 1309, 1321 (11th Cir. 2021) (quoting *State Farm*, 463 U.S. at 43). That is, "an agency may not 'disregard available scientific evidence that is in some way better than the evidence [the agency] relies on.'" *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 488 F. Supp. 3d 1219, 1227 (S.D. Fla. 2020) (quoting *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 998 (D.C. Cir. 2008)). "[A]n agency cannot ignore

evidence that undercuts its judgment; and it may not minimize such evidence without adequate explanation." *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018).

111.  Here, FDA appears to have simply disregarded the considerable evidence before it pertaining to tradipitant's safety—and did so without explanation. This is arbitrary and capricious. *See Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1275 (11th Cir. 2009) (agency statement that particular birds are "difficult to detect" was contradicted by the agency's own record, which showed the birds had been counted on an annual basis since the 1960s).

112.  Furthermore, FDA's *own guidance*, which it clearly relied on to form the basis of its clinical hold letter, undermines the agency's position. The ICH Guidance acknowledges that in instances "where significant therapeutic gain has been shown, trials can be extended beyond the duration of supportive repeated-dose toxicity studies on a case-by-case basis." ICH Guidance at 7. Here, there is significant evidence of the therapeutic benefit that tradipitant can provide to patients with motion sickness, and an overwhelming safety record based on the studies conducted so far. FDA does not explain why tradipitant does not meet the standard for allowing clinical studies to be conducted for longer than the repeated-dose toxicity animal studies.

113.   Moreover, FDA's decision is not logically coherent. FDA has long required nine-month nonrodent toxicity studies to support human studies longer than three months in duration. Now, however, FDA insists that Vanda conduct a six-month nonrodent toxicity study, without any explanation for why the three-month daily-dosing study in dogs (which has already been conducted) does not provide sufficient evidence for a study involving sporadic, acute dosing lasting longer than twelve months. There is no scientific basis to justify a six-month study in addition to the studies that have already been conducted—especially when the treatment is non-consecutive—and FDA provides none.

114.   Agency reasoning that is "internally inconsistent" cannot survive arbitrary and capricious review. *See ANR Storage Co. v. FERC*, 904 F.3d 1020, 1028 (D.C. Cir. 2018); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 488 F. Supp. 3d 1219, 1229 (S.D. Fla. 2020) (agency decision lacking "internal consistency" must be vacated and remanded).

### 2.    *FDA's partial clinical hold decision is not adequately explained.*

115.   *Second*, a basic requirement of agency action is "that the agency adequately explain its result." *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995). In other words, "[a]n agency decision is arbitrary and capricious if it is not reasonably explained." *Antilles Consolidated Educ. Ass'n v. Fed. Labor Relations Auth.*, 97 F.3d 10, 15 (D.C. Cir. 2020). This requirement "is not a

42

high bar, but it is an unwavering one." *Judulang v. Holder*, 565 U.S. 42, 45

(2011); *see also Tourus Recs., Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001)

("A fundamental requirement of administrative law is that an agency set forth

its reasons for decision; an agency's failure to do so constitutes arbitrary and

capricious agency action." ).

116.    Here, FDA provided no explanation for its decision beyond repeat-

ing its unsupported and unjustified requirement that Vanda conduct longer-

term nonrodent toxicity studies. FDA did not meaningfully engage at all with

the additional evidence of tradipitant's safety Vanda placed before it. And

when an agency "fail[s] to provide any coherent explanation for its decision …

the agency's action [is] arbitrary and capricious for want of reasoned deci-

sionmaking." *Fox*, 684 F.3d at 69.

117.    "Conclusory statements" by the agency "will not do." *Amerijet Int'l,

Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014). An "agency's statement

must be one of *reasoning*." *Id.* (emphasis in original). The FDA's conclusory,

boilerplate response to Vanda without further elaboration, is not a statement

"of reasoning," *Amerijet*, 753 F.3d at 1350, as it includes no reasoning at all.

118.    This, alone, is enough to for the Court to vacate the partial clinical

hold. *See Select Specialty Hosp.–Bloomington, Inc. v. Burwell*, 757 F.3d 308,

312 (D.C. Cir. 2014) (noting that when "an agency's failure to state its reasoning or to adopt an intelligible decisional standard is ... glaring ... we can declare with confidence that the agency action was arbitrary and capricious.").

### 3.    *FDA's partial clinical hold treats similar medications differently.*

119.    *Finally*, FDA's partial clinical hold is arbitrary and capricious because it does not treat like situations alike.

120.    "A fundamental norm of administrative procedure requires an agency to treat like cases alike. If the agency makes an exception in one case, then it must either make an exception in a similar case or point to a relevant distinction between the two cases." *Westar Energy, Inc. v. Fed. Energy Regul. Comm'n*, 473 F.3d 1239, 1241 (D.C. Cir. 2007); *see also Colo. Interstate Gas Co. v. FERC*, 850 F.2d 769, 774 (D.C. Cir. 1988) ("[T]he Commission's dissimilar treatment of evidently identical cases ... seems the quintessence of arbitrariness and caprice").

121.    As Vanda explained in its letter to FDA, the agency has previously approved other drugs for acute treatment with toxicology studies that were only 28 days long. Vanda noted that FDA approved Igalmi® for the "acute treatment of agitation associated with schizophrenia or bipolar I or II disorder" based on a 7-day non-GLP and 28-day GLP repeat dose toxicity studies in dogs. *Id.* FDA has also approved Singulair® for the "acute prevention of exercise-

induced bronchoconstriction" based on a 28-day repeat dose toxicity study in dogs. Neither of the approved labels for either drug limit the patient's lifetime dosing to only taking 28 doses of the drug.

122.    FDA has not provided any explanation for why it has chosen to require longer repeat dose toxicity studies for Vanda's acute, non-consecutive dosing with tradipitant, where it previously approved non-consecutive, acute dosing of other drugs based on far shorter toxicity studies. As a result, that unequal treatment is arbitrary and capricious.

### E.    FDA's partial clinical hold was signed by an invalidly appointed officer.

123.    In our constitutional system of government, only "Officers of the United States" may "exercise significant authority pursuant to the laws of the United States." *United States v. Arthrex*, 594 U.S. 1, 12-13 (2021) (first quoting U.S. Const. art. II, § 2, cl. 2, then quoting *Buckley v. Valeo,* 424 U.S. 1, 126 (1976)).

124.    Thus, "any appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed in the manner prescribed" by the Appointments Clause. *Buckley v. Valeo,* 424 U.S. 1, 126 (1976) (per curiam); *see also* U.S. Const. art. II, § 2, cl. 2 (an officer may be appointed either by the President

with advice and consent from the Senate, or by a "Head[] of Department" in whom "Congress" has "by law vest[ed]" the appointment power).

125.   Issuing a partial clinical hold involves the "exercis[e]" of "significant authority pursuant to the laws of the United States" because it is a final decision that binds the agency and third parties. *Lucia v. SEC*, 585 U.S. 237, 245 (2018) (quoting *Buckley v. Valeo*, 424 U.S. 1, 126 (1976)); *see also Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 78 (2007) (any "power lawfully conferred by the Government to bind third parties, or the Government itself, for the public benefit" must be exercised by an officer). As a result, only a properly appointed officer may do so.

126.   The partial clinical hold in this case was not issued by a constitutionally appointed officer.

127.   The partial clinical hold on Vanda's Study 3403 was issued by Dr. Jessica J. Lee, the Director of the Division of Gastroenterology within the Office of Immunology and Inflammation, in FDA's Center for Drug Evaluation and Research (CDER) and "reviewed and affirmed" by Dr. Nikolay Nikolov, director of the Office of Immunology and Inflammation, also within CDER.

128.   Neither Dr. Lee nor Dr. Nikolov was appointed by the President and confirmed by the Senate. *See* United States Government Policy and Supporting Positions (Plum Book), 2020, at 69-70 (stating that the only Senate-confirmed FDA official is the Commissioner himself),  perma.cc/84Q8-MBEM.

46

129.    Further, neither Dr. Lee nor Dr. Nikolov has been validly appointed by a "Head[] of Department." *See Arthrex*, 594 U.S. at 12-13 ("Congress may vest the appointment of [inferior] officers 'in the President alone, in the Courts of Law, or in the Heads of Departments.") (quoting U.S. Const. art. II, § 2, cl. 2).

130.    Nor could Dr. Lee or Dr. Nikolov be validly appointed, because they do not occupy a position whose appointment Congress has "by law vest[ed] … in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. That is, "[t]he head of a department has no constitutional prerogative of appointment to offices *independently* of the legislation of congress." *United States v. Perkins*, 116 U.S. 483, 485 (1886) (emphasis added). And there is no statute which vests appointment authority for Dr. Lee or Dr. Nikolov's position in any of the constitutionally prescribed alternative authorities.

131.    This stands in stark contrast to other components of the Department of Health and Human Services. With respect to the Social Security Administration, for example, the Secretary of Health and Human Services is empowered to "*appoint* and fix the compensation of such *officers* and employees … as may be necessary for carrying out the functions of the Secretary under [chapter 7 of Title 42]." 42 U.S.C. § 913 (emphasis added). And in the 21st

Century Cures Act, Pub. L. 114–255, § 2033, 130 Stat. 1033, 1057 (2016), Congress specifically authorized the Secretary of HHS to appoint the National Institutes of Health (NIH) Institute and Center (IC) Directors—who are considered inferior officers under Article II, Section 2 of the Constitution. *See* 42 U.S.C. § 284(a)(1); *see also* Letter from Hon. Cathy McMorris Rogers, Chair, Energy and Commerce Committee, et al., to Secretary Xavier Becerra, U.S. Department of Health and Human Services (July 7, 2023).

132.    Nor can general housekeeping statutes provide the necessary authority; the "power to 'keep house' … is not the same as the power to 'build the house' by appointing officers." *United States v. Concord Mgmt. & Consulting LLC*, 317 F. Supp. 3d 598, 622 (D.D.C. 2018).

133.    Congress has not "vested" authority in the Secretary of Health and Human Services to appoint officers to the position held by Dr. Lee or Dr. Nikolov. Thus, even if they had been appointed by the HHS Secretary, their appointments would not have been pursuant to power vested by Congress in a proper authority. They therefore cannot validly exercise the authority of the United States, and any actions taken by them in the purported exercise of such authority—including the partial clinical hold here—are void ab initio.

48

## CLAIMS FOR RELIEF

### COUNT I
### ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)
### (agency action contrary to law)

134.  Plaintiffs incorporate and re-allege the foregoing paragraphs as though fully set forth herein.

135.  The APA authorizes courts to set aside agency action that is contrary to law. 5 U.S.C. § 706(2).

136.  The FDCA specifically authorizes, as sufficient evidence to support a drug's safety, nonclinical testing that includes cell-based assays, organ chips and microphysiological systems, computer modeling, and other nonhuman or human biology-based test methods, as alternatives to lethal animal studies. 21 U.S.C. § 355(z).

137.  FDA's imposition of a partial clinical hold, based exclusively on FDA's own insistence that Vanda conduct unnecessary toxicology studies in nonrodent species (i.e., dogs) is therefore unlawful and must be set aside.

### COUNT II
### ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)
### (arbitrary and capricious agency action)

138.  Plaintiffs incorporate and re-allege the foregoing paragraphs as though fully set forth herein.

139.  The APA authorizes courts to set aside agency action that is arbitrary and capricious. 5 U.S.C. § 706(2).

140.    An agency must base its actions "on a consideration of the relevant factors" and "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (citations omitted).

141.    Agency action must be set aside where, as here, the agency "has failed to 'examine[] [the] relevant data.'" *Genuine Parts Co. v. EPA*, 890 F.3d 304, 311-12 (D.C. Cir. 2018) (quoting *Carus Chem. Co. v. EPA*, 395 F.3d 434, 441 (D.C. Cir. 2005)). "[A]n agency cannot ignore evidence that undercuts its judgment; and it may not minimize such evidence without adequate explanation." *Id.* at 312.

142.    In its partial clinical hold letter, FDA asserted that there was "insufficient information to assess risks to human subjects." But FDA disregarded considerable evidence before it pertaining to tradipitant's safety. FDA's failure to address this evidence and provide a reasoned explanation of its clinical hold was therefore arbitrary and capricious.

143.    Further, "the requirement that agency action not be arbitrary and capricious includes a requirement that the agency adequately explain its result." *Dickson v. Sec'y of Def.,* 68 F.3d 1396, 1404 (D.C. Cir. 1995). FDA did not adequately explain its reasoning for requiring a six-month nonrodent toxicity study, nor did it explain why it treated similar acute indications for other conditions dissimilarly to Vanda's proposed indication.

144.   "[W]hen an agency fails to state the reasons for its decision, then courts should remand the case to the agency for further explanation." *Sierra Club v. Salazar*, 177 F. Supp. 3d 512, 531 (D.D.C. 2016).

145.   Therefore, FDA's decision was arbitrary and capricious and must be "set aside." 5 U.S.C. § 706(2)(D).

**COUNT III**
**ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(D)**
**(agency action taken without observance of procedure**
**required by law)**

146.   Plaintiffs incorporate and re-allege the foregoing paragraphs as though fully set forth herein.

147.   To the extent FDA it imposed the partial clinical hold on Vanda based on standards established "by regulation" under 21 U.S.C. § 355(i)(3)(B)(ii), it acted without observance of the notice-and-comment rule-making procedures required by law. 5 U.S.C. § 706(2)(D).

148.   Before issuing a binding, legislative rule, the APA requires administrative agencies to publish within the Federal Register a "[g]eneral notice of proposed rulemaking" and to "give interested persons an opportunity to partic-ipate in the rule making[.]" 5 U.S.C. § 553(b), (c); *see also Utility Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 752 (D.C. Cir. 2001) ("[T]here must be publication of a notice of proposed rulemaking; opportunity for public comment

on the proposal; and publication of a final rule accompanied by a statement of the rule's basis and purpose.").

149.   Here, despite characterizing the ICH guidance as non-binding, FDA plainly treated the ICH guidance as a substantive rule. FDA may not legally require regulated parties to comply with the ICH guidance as a legislative rule without first subjecting it to notice and comment. Thus, FDA's partial clinical hold, based on the ICH guidance, is agency action taken "without observance of procedure required by law," and must be set aside. 5 U.S.C. § 706(2)(D).

**COUNT IV**
**ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)**
**(agency action contrary to agency policies and procedures)**

150.   Plaintiffs incorporate and re-allege the foregoing paragraphs as though fully set forth herein.

151.   Under *United States ex. rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), federal agencies "must adhere firmly to self-adopted rules by which the interests of others are to be regulated." *Mass. Fair Share*, 758 F.2d at 711. Failure to do so amounts to an "unlawful" agency action under the APA.

152.   FDA's own regulations require that the agency conduct a meaningful discussion in an attempt to satisfactorily resolve the issue before the agency imposes a clinical hold. 21 C.F.R. § 312.42(c).

153.   FDA did not do so here.  Thus, FDA's imposition of a clinical hold here did not adhere to its own policy governing imposition of a clinical hold and is therefore unlawful under the APA and must be set aside.

## COUNT V
## U.S. CONST. ART. III, § 2, CL. 2
## (improperly appointed officer)

154.   Plaintiffs incorporate and re-allege the foregoing paragraphs as though fully set forth herein.

155.   FDA's empowerment of Dr. Lee and Dr. Nikolov violates the appointments clause of the United States Constitution because neither of them is a validly appointed officer of the United States.

156.   Dr. Lee and Dr. Nikolov were not appointed by the President with the advice and consent of the Senate. U.S. Const. art. II, § 2, cl. 2. Moreover, neither Dr. Lee nor Dr. Nikolov occupies a position whose appointment Congress has "vest[ed]… in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. They therefore cannot be either principal or inferior officers, and cannot exercise power reserved to such officers.

157.   Because the power to impose a clinical hold can be properly executed only by an officer, and because Dr. Lee and Dr. Nikolov are not properly appointed officers, the clinical hold is unlawful.

158.   FDA's failure to comply with the Appointments Clause renders its action unconstitutional in violation of the Appointments Clause and the separation-of-powers principles recognized by the Supreme Court.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in their favor and that the Court:

(a) Hold unlawful and set aside FDA's partial clinical hold for Study 3403;

(b) Declare that FDA's partial clinical hold for Study 3403 is unlawful, null, and void under the Declaratory Judgment Act, 28 U.S.C. § 2201;

(c) Award plaintiffs attorney's fees and costs; and

(d) Award plaintiffs such other and further relief as the Court may deem just and proper.

Dated: January 14, 2025

Respectfully submitted,

/s/ *Audrey M. Pumariega*
Audrey M. Pumariega
Florida Bar No. 85206
MCDERMOTT WILL & EMERY LLP
333 SE 2nd Avenue
Suite 4500
Miami, FL 33131
(305) 358-3500
apumariega@mwe.com

Paul W. Hughes (to file *pro hac vice*)
Sarah P. Hogarth (to file *pro hac vice*)
Andrew A. Lyons-Berg (to file *pro hac vice*)
Grace Wallack (to file *pro hac vice*)
MCDERMOTT WILL & EMERY LLP 500
North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com
shogarth@mwe.com
alyonsberg@mwe.com
gwallack@mwe.com

*Attorneys for Plaintiffs*